The union's defense in this case rests on a series of fabrications. First, that the scope and pension concessions would have been, and I'm quoting from Appellant D. Averly's brief, would have major long-term effects on continuing employees who would suffer under the concessionary terms of the new six-year collective bargaining agreements. The committee chose to provide, in this case, more than 95% of the equity to continuing employees as compensation, they claim, for their prospective sacrifices under the new CBAs. Later in the... We're talking here about the duty of fair representation. Yes, Your Honor. So, you'll have to channel your criticism in that context. We're not here to decide whether it was a good decision or a bad decision. The question is whether the duty was violated, and there's a lot of quality to that. Yes, Your Honor, and the duty is violated when you run so far out of the range of reasonableness as to be irrational. In fact, when it is a bad decision. So, ultimately, some of the facts do matter in this case, and we're before the court on a motion to dismiss threshold, and the Iqbal-Tuamly standard, of course, requires that the court adopt or accept as true all well pleaded facts. Yes, Your Honor, please help me with this. If I understand the record correctly, the union advised the people who were not going to take the buyout package and so on, that there's going to be an equity component here. We don't know how it's going to work. We don't know what you're going to share or what you're not going to share. They did a lot of, I don't know what I'm going to call it, surveys. Probably weren't surveys. They inquired. They checked a lot of things out, and ultimately, they made a decision that, to me, is an exercise of judgment, which, of course, doesn't help you. Why was what was done here not an exercise of judgment? I mean, we agree with the judgment or not, but why wasn't it? Because this was a raw exercise in political power. What they did was they took all of the equity that, in fact, was obtained in trade or in exchange for the concessions, the claims, made by the union members, the bargaining unit, and they gave all of it to members who remained in the union and excluded those who took early separation. The early separation, who, by the way, some of them were still employed at American Airlines at the time the equity was distributed. So there is no case, neither party has cited a case to the court where members of a bargaining unit whose claims were traded or released in exchange for consideration were completely shut out of any of that consideration, and that was found to be not a breach of the duty of fair representation. Well, who remained didn't get the buyout either. Your Honor, the people who remained got their jobs. The problem we have, and let me, if I might, Your Honor, timeline is critical. In this case, in August 2012, the union bargained with American Airlines and obtained a commitment of equity, 4.8% equity. There were several components to it. And that equity was in exchange for all of the claims in the bankruptcy advanced by union members. Our clients, our class, was part of that group. In fact, about 12% of that group, a significant portion of the group. Subsequently, in September, on September 12th, the new collective bargaining agreements took effect, and at that moment, their claims in the bankruptcy were gone, were released and extinguished. After that, there was the promotion by the union of early separation. The senior members of the union could not be forced to retire, or if there was a layoff as a result of the bankruptcy, those senior members would keep their jobs, and junior members would be laid off or put on furlough. What happened was the union negotiated with American Airlines and in a separate transaction promoted this early separation to free up spot it spent to to save the jobs of junior members. One of the misrepresentations made to the court is the nature of the early separation package. For example, there's a representation that if you read the appellate's brief, it says that everybody got $12,500 special severance, they got a $10,000 severance allowance, and then they got their regular severance. It's not true. Only individuals whose system or station were protected from any type of layoff or furlough or discharge were given the special severance payment of $12,500. No one got even their regular severance. They got their regular severance less than two weeks, which for many of these people would have been several thousand dollars. So they didn't even get regular severance, and they effectively got, for many of these people, what they got was a one-time $10,000 payment less than what they should have gotten for regular severance. So this is not some golden handshake. Yes, sir? You made the statement that this is a raw exercise of political power. Yes, sir. But I don't see anything in the record which would point to overt evidence of political animus. The evidence is this, Your Honor, and this is why it's important at this stage, the proceedings on a motion to dismiss. And this is why I started with the fabrication. As the court, as this court has ruled, in fact, collecting one of the leading Pickball-Tomley cases in the circuit, if there are plausible theories advanced by both the plaintiff and the defendant, then they survive the motion to dismiss stage. Yet, however, if the facts of one discredit the other or make the other implausible, then only the one theory is accepted. What's happened here is the facts have been misrepresented by DWU, and the actual facts support only the plaintiff's version. And let me give you an example, and this is the easiest one. They represent to the court that the scope and intents of concessions, and this is what I started with a moment ago, would have major long-term effects on continuing employees. So they're saying this is all prospective. In fact, they used the word. They say the committee chose to provide the more than 95% of the equity, more than 95% is what it was, to continuing employees as compensation for their prospective sacrifices under the new collective bargaining agreements. Later on, they say, at page 20 of their brief, the early separations would not suffer over the next six years the concessions for which America granted the equity. It's not true. And in fact, it's not true, and demonstrated by the facts in this case. The votes show that the union took to explain the equity distribution plan. Yes, Your Honor. As this comes online, my understanding is that coming out of the bankruptcy, the union members took quite a haircut from what they were earning. Is that correct? No, Your Honor. It's not. No, Your Honor. What they lost were they lost pension benefits. They lost retiring medical benefits. Those aren't haircuts. Well, those are haircuts, Your Honor. But the important thing is that the people that suffered those haircuts were senior employees. Well, my point is that it's my understanding that those who are continuing are going to lose, to your point, some pension benefits and some health insurance benefits and so on. But the people who got what happened, did they lose them? Yes, Your Honor. They did? Yes, Your Honor. And they were treated exactly the same in those categories as the people who were continuing? No, Your Honor. They were not treated the same, and that's the point. The truth of what happened is demonstrated in the equity distribution methodology, and this is at Record Excerpt 542, and you can continue on 543 and 544. The equity distribution scope, share methodology, so this is 42% of the equity distribution. How is it distributed? What it said was the scope rules reflect sacrifices made by members over the years, over the years, to obtain and retain scope rules preserving work. What it's telling you is these are past sacrifices. And it goes on to say that the scope concession, the scope equity, was going to be divided based on seniority and based on wage rate. That's not prospective. The people who had been working the longest, who had, in other words, made those sacrifices over the years, they got the most. In fact, in some instances, they got five times as much. The senior continuing employees got five times as much of the scope equity as the junior employees did. And it's because the scope concession was made to compensate for past sacrifices, not prospective. There is evidence in the record that about maybe 25%, as much as 25% of the scope equity was for future concessions, but that's all. And that would have been only 10% of the overall equity. Similarly, the equity distribution for the pension freeze, the pension freeze froze pensions back as of November in 2011. So long before the early separation happened or even the equity distribution formula. And yet, the pension freeze diminishes the final average salary used for future pension calculations. This affects, of course, retiring people at the end of their career much more than it affects people who are just beginning their career. And again, the secret, the telltale, the flag is that the stock distribution for the pension segment of the equity, which is about 20%, was based on straight time, all in rate. In other words, the wage rate. Clearly, the more senior, more valuable employees had a higher wage rate. And they again got more of that equity. So it's not that the young employees who were going to be making all these sacrifices in the future that got equity concessions for their future prospective LTs or givebacks. It was actually the people who made the sacrifices in the past whose claims were then released in the bankruptcy. All of these claims were wiped out in the bankruptcy before there was an early separation. Even the equity distribution, the defendant represents that the equity distribution of the Me Too, that's 1.7%, was somehow tied to the concessions made that were prospective for scope and pension. When in fact, of course, the Me Too was not tied to any specific concession. And even the president of the union who negotiated the Me Too said that should go to everyone. And in fact, again, at Record Excerpt 544, it did go to everyone. The Me Too shares were divided equally amongst all eligible without regard to whether they were junior or senior. So in those three situations, our clients, the class, only want to be treated the same. They want to be treated just as those whose claims were traded for equity. They want to be treated the same, since their claims were also traded for equity. So you're down to about two minutes. Are you going to resume? Yes, ma'am. We'll hear from the union. Good morning, Your Honors, and may it please the Court. My name is Connie Chan. I represent Defendant Appletree Transport Workers Union of America. I'd like to begin by first addressing the legal principles that govern plaintiffs' attempt to state a DFR claim based on the alleged arbitrariness of the union's equity distribution plan. And then I'd like to turn to the record to show how plaintiffs' own pleadings established that the union had a clear rational basis, and its decision clearly fell within the wide range of reasonableness that unions are accorded. First, plaintiffs have complained that the district court imposed a heightened pleading standard. But under Iqbal Twombly and this court's eclectic properties decision, it's clear that the court must begin by looking at the substantive elements of the claim that plaintiffs are trying to assert. Here, under the deferential Alpha v. O'Neill standard that clearly governs any substantive review of a union's decisions, and that clearly applies here, plaintiffs have an extraordinarily high burden. They must allege facts that make it plausible to conclude that the union's decision was wholly irrational, and it's without any rational basis or explanation whatsoever. If any rational explanation for the union's conduct appears from the place of the pleadings, then they have not stated a claim because the union's decision cannot be both rational and at the same time wholly irrational. And as this court explained in the eclectic properties, the court must consider on a 12 v. 6 motion any obvious alternative explanations, and if a rational explanation for the union's conduct appears on the face of the pleadings, then plaintiffs' burden is to plead facts that are not only consistent with their claim, with their theory of liability, but that are true. Your opposing counsel also cited eclectic. Where did he go wrong? Your Honor, because plaintiffs, under eclectic properties, plaintiffs have to plead facts that tend to exclude the possibility that the union's conduct had a rational basis. Clearly here, based on the face of plaintiffs' own pleadings, the union's equity distribution plan had a rational basis. Turning to the record, the union chose to allocate the equity in accordance with the sources of the value of the equity, according to American Airlines' own statements. The rationale for the union's equity distribution plan is very clearly stated in its equity distribution plan, which is excluded 12, that plaintiffs attach to their own complaint. And in that equity distribution plan, the union clearly explains that the equity was granted in exchange for scope and pension concessions that American Airlines itself identified as having a major benefit to American Airlines in saving for major labor cost saving concessions that allowed American Airlines to operate efficiently and emerge from bankruptcy. But under our case law, if the plaintiffs are correct that they got a wrong deal, but your clients had a rational basis for doing it the way they did, where perhaps they gave the other folks a bit of a haircut, but on the other hand, there was still a rational basis to keep the ongoing employees happy, is that enough to satisfy eclectic properties? Under eclectic properties, as long as there is a rational basis for the union's decision here, then plaintiffs have not met their burden of giving a plausible claim that the union has harmed it. I think I need to get back to the specifics here that you raised. This is not black and white, and maybe to the point that a lot of the sacrifices that were made that resulted in the equity sharing out of the bankruptcy were made by their plaintiffs. I assume you don't dispute that. But on the other hand, the union said, you know, we acknowledge that, but we've got these people going forward, and over time, they're going to suffer more, and we think it's better to give most of it to them. Is that enough to satisfy eclectic property? Absolutely, Your Honor, because as the court noted at the outset of Plaintiff's argument, this was a discretionary judgment within the union's discretion to make. This is what I mentioned to you about the court's lesson. This is a judgment. This is absolutely a judgment, and the Supreme Court has repeatedly analogized the relationship between courts and unions to that of unions and legislatures. And there are important reasons why the court has drawn that analogy and explained why unions are entitled to the same level of deference. In Alma v. O'Neill, the Supreme Court expressly cited cases like Daybright Lighting and U.S. v. Carly products invoking the rational basis review principles for which those cases stand and specifically quoted language from those cases that the court should not sit as a super legislature in questioning or substituting for the union's judgment and that where a decision is at least debatable, the decision of the union must be allowed to stand. Furthermore, the reason for this comparison is important. The Supreme Court recognized that the work of a union in allocating costs and benefits among its members is very much like the work of a legislature when crafting economic and social welfare legislation. In both tasks, lines inevitably must be drawn, and the drawing of those lines will inevitably result in one grouply treated cycle. A legislature doesn't have the duty of fair representation. Well, actually, in Alma v. O'Neill, the Supreme Court said that, in the same way that a legislature's decisions are subject to at least a rational basis review, a union's decisions of discretionary judgments must likewise be subject to rational basis review. What's your response to the assertion that this was an irrational allocation motivated by political animus? I think the district court correctly held that there are clearly no plausible allegations in this complaint that support an inference that the union was in any way motivated by political animus. For one thing, the allegations establish that the union, in fact, did not discriminate against anyone on the basis of political power. In this case, in fact, the union did allocate equity for the portions of the equity attributable to the 29 decrement settlements for the overpayments, health insurance premiums, and for the outsourcing of 757 overhaul work. They did include plaintiffs in the distribution for those portions of the equity. Moreover, the union did not make a decision specifically based on whether a member had political power or not. For example, the union included those who were deceased or whose positions had been eliminated as a result of the scope concessions altogether. Those individuals clearly lacked political power in the same way that plaintiffs are claiming they lack political power, and yet the union included them in the distribution. Is this sort of like saying that instead of saying you never want to watch sausage or legislation, man, you're saying here you never want to watch sausage or unions, and if it's not the case, is that what we're saying here? Well, I think there are two points I want to make about this idea about discovery. Plaintiffs are contending that notwithstanding the fact that American Airlines clearly stated in its bankruptcy filings that this equity was granted for the scope and pension concessions prospectively, those concessions that would apply under the 2012 through 2018 collective bargaining agreements, notwithstanding the union's own representation that that is what the equity was granted for, plaintiffs are insisting that they're entitled to discovery to depose American Airlines to find out exactly what was said at the bargaining table. And they're suggesting that this court cannot, in fact, judge the rationality of American Airlines and TWU's agreement until it calculates the exact precise value of every concession that was made, the exact financial impact of every concession on every member, and the exact probability of the union prevailing on the merits of each of its prepetition grievances that it agreed to waive as part of the overall negotiations. That's not what the duty of fair representation requires. It doesn't require that type of mathematical exactitude. It simply says, is there a rational basis for the union's decision? Here, the union chose to draw a bright, easily administrable line between individuals like plaintiffs who had made a voluntary decision in late 2012 that they would rather take a guaranteed lump sum payment of cash and leave American employment rather than continue working under the concessionary terms of the 2012 CBA that would govern for all working employees from 2012 through 2018. The union... Let's get to the... Had the plaintiffs made the decision to leave Americans' employment before or after the end of the terms of this allocation of equity, among other things? They made the decision before the union had even begun to formulate a plan, and that is exactly why the district court correctly found that there are no plausible allegations here of bad faith. There's no allegation that the union made an affirmative misrepresentation or misled plaintiffs to take these early out buyout offers. And, in fact, the plaintiff's own proceedings directly contradict their conclusory assertion that the union was trying to goad people into taking these offers. This was very much a voluntary decision, and I think the letter from Air and Transport Director Less, which plaintiffs attached as Exhibit 1 to their complaint, shows exactly how the union was trying to be fully transparent in making its decisions and its communications with its members. That Less letter, which plaintiffs tried to construe as a misrepresentation, the letter read in its entirety, in fact, clearly put members on notice that the value of the equity had not been determined, the future of the company would not be known until at least February of 2013, that the decision whether to retire or not was very much a personal decision and that the union was not trying to push anyone in one direction or another. And do I recall correctly that one of the presidents or somebody's letter to the union said that there was a distinct possibility that the people who left America might not get any equity? Did I read that incorrectly, or did you get a very diminished portion of it? That's correct. There was a decision about whether to include, there was discussion that it would be unfair under plaintiffs' theory that this equity was, in fact, not granted as American Airlines and then unions say it was for prospectives of potential concessions, but under plaintiffs' theory that this equity was, in fact, also granted in part for historical concessions. Under that theory, the union said, well, that anyone who had worked at American Airlines from 2003 to under the 2003 concessionary contracts would be equally entitled to a share of that equity. That would be an unfair and unadministrable equity distribution plan. It would be unfair to the continuing employees who suffered not just a 2003 CBA, but are going to furthermore suffer the scope of concessions from 2012 through 2018. And I'd like to just clarify what these scope concessions really meant, because plaintiffs have made this conclusory representation for a suggestion that these scope concessions had a historical impact. That's simply not true. These were concessions under a collective bargaining agreement that would govern the working conditions of employees at American from 2012 through 2018. And those scope concessions do not just result in the elimination of certain positions, although that is also true with respect to the Title II cabin cleaners. But more importantly, the changes to the scope rules meant that American Airlines was now able to outsource certain categories of work that had previously been preserved exclusively to the union. And that meant that there was less work to go around throughout the entire unit, and that was going to have cascading effects throughout the entire membership, less work to go around among all members applying the seniority rules under the union. That kind of goes to the haircut concept that I had raised with opposing counsel earlier, that those who were going to remain with American were going to have fewer benefits, in this case fewer jobs, because some of them would be outsourced. Maybe if the hours were changed or something like that. But the reality is, whether it was fair, there was, from your perspective, at least a rational basis for it. It was a decision made based upon a judgment, and that is, from your perspective, all that's required. Exactly, Your Honor. And even accepting Plaintiff's allegations, that's true. Even accepting the allegation that some of these early retirees may have continued working for an additional few months under the terms of this new contract, the fact of the matter is that they had made a voluntary decision to terminate their employment and not to continue working under the concessionary terms of this collective bargaining agreement, in contrast to those employees who, as of July 26, 2013, were still there, had been there throughout the bankruptcy, but were also going to continue to be there and continue to suffer under these contracts. To suffer not only the impact of the scope concessions, the pension freeze, which impacted, of course, their ability to continue accruing pension benefits, but did not, importantly, did not affect any accrued benefits that Plaintiffs had already accrued under the prior contract. They were going to suffer the scope concessions, the pension concessions, changes to vacation policies, changes to holiday pay, all kinds of concessions. And the duty of fair representation does not require a union to justify its discretionary decisions by providing a precise mathematical breakdown of the value of every concession made under a collective bargaining agreement and the precise mathematical impact on every member. The decision that the union made here to draw a bright line may not have been precise. It may not have been mathematically perfect. It may not even be the line that this Court would have drawn standing in the union's shoes. But Plaintiffs' pleadings simply do not permit any plausible inference that the decision or that the union chose to draw that line was wholly irrational. And I'd like to, I'm sorry, I see that I'm just about out of time. We have five seconds. For all these reasons, I ask that you refer to the District Court's dismissal ruling. Very well. Thank you, Counsel. Mr. Kandel, you have reserve time. Your Honor, there's no mathematical decision required to get zero. It is rational to say, I want more money. And the people on the committee who made the decision to exclude those who had retired or had made a decision, some of them, as I said, didn't leave until after the equity distribution occurred. It is rational to say, I want more money. I get 13% or 12% more money if I exclude you. That's rational, but that's not permitted. Yes, Your Honor. What is your response to opposing Counsel's comment that there was an earlier, I think she said 2003, concession agreement, that if you're going to include people's past contributions, you would also have to include, I mean, rather than include people that you have not wanted to include before. And that's the kind of speculation that the trial court engaged in, which we think is just not permitted under the Baltimore public standard. We have pleadings. We represent these people. This is a disaffected class. This class was denied any participation in the SCOPE pension or Me Too equity. More than 95% of the equity obtained. Their claims were traded as part of the consideration for that equity, and they got zero. And it is not in the Addington case, from this circuit, just recent, the court said while they dealt with seniority, and the court found specifically that, while what they may have done might have been rational in another basis in this case, it was the raw exercise of political power. And that's what happened because these people, because they have retired or are about to retire, they no longer vote. They no longer have any power in the union. And so they're gone, and we can cut them out, exclude them from any participation, and that's okay. The cases, the court, and I think, Judge Smith, you asked this question, and I think this is, I would refer the court to Bredinger, sided and united, and it's as the union's power increases, its responsibility to exercise that power also increases. In this case, there was maximum discretion. Thank you. Thank you. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Gould, M. Smith